## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Abingdon Division

| | | |
|---|---|---|
| ANNE MEREDITH SUGAR, | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | Civil Action No. 1:20cv00005 |
| | ) | |
| EMORY & HENRY COLLEGE, | ) | |
| Defendant. | ) | |

This matter is before the court on the Defendant's Motion For Summary Judgment, (Docket Item No. 47) ("Motion"). The Motion was heard by the undersigned magistrate judge on June 29, 2021. Based on the arguments and representations of counsel contained in the Motion and related pleadings and presented at the June 29 hearing, and the evidence before the court, and for the reasons set out in this Memorandum Opinion, the court will grant the Motion and enter summary judgment in the defendant's favor on the plaintiff's remaining claims.

## I.    Facts

The plaintiff, Anne Meredith Sugar, ("Sugar"), sues her former employer, Emory & Henry College, ("Emory"), claiming that Emory discriminated against her in her employment and termination and breached her contract.[1] In particular, Sugar has filed claims of sex discrimination and sex-based wage discrimination, disparate treatment, disparate impact and retaliation under Title VII of the Civil Rights Act of

---

[1] Sugar's Complaint also contained claims of violation of the Equal Pay Act, retaliation under the Equal Pay Act and fraud in the inducement, but those claims have been dismissed by separate order based on plaintiff's stipulation that she did not have the evidence necessary to proceed on those claims.

1964 and sex discrimination and retaliation under Title IX of the Higher Education Act of 1972. Sugar was hired by Emory in the spring of 2018 as an Assistant Professor of Mass Communications beginning with the Fall Semester of 2018. By letter dated June 8, 2018, Jake B. Schrum, then President of Emory, offered Sugar a "tenure-track" position with an annual salary of $53,500.00 beginning August 1, 2018. (Docket Item No. 48-1) ("Offer Letter").  The Offer Letter stated that Sugar would be reimbursed up to $3,500.00 for moving expenses. The Offer Letter also stated:

> This agreement is made subject to the requirements and policies of Emory & Henry College as outlined in the *Faculty* and *Employee Handbooks*. As such, this appointment and salary are in consideration of your faithful performance of the duties and responsibilities assigned to you as a faculty member.

Sugar signed and dated the Offer Letter on June 18, 2018.

Schrum has testified that a tenure-track position typically lasts from six to seven years, during which time the employee is evaluated and, if the employee satisfies the college's expectations and the college is financially able to support them, the employee would be offered a tenured position. (Deposition of Jake Schrum, (Docket Item No. 48-11) ("Schrum Deposition"), at 40-41.) In her deposition, Sugar admitted that she understood that a tenure-track position did not guarantee a tenured position. (Deposition of Sugar, (Docket Item No. 57-6) ("Sugar Deposition"), at 32-33, 39.) Sugar agreed that whether or not a professor received tenure would depend not only on the professor's job performance, but also upon the institution's ability to offer a tenured position. (Sugar Deposition at 33.) Sugar also

has admitted in her discovery responses that her employment with Emory was terminable at will. (Docket Item No. 48-2 at 1.)

John Wells, then Provost of Emory, originally offered Sugar only $1,500.00 in reimbursed moving expenses. However, Sugar learned that a male employee who was hired at the time she was hired was offered $3,500.00. (Sugar Deposition at 48-50.) Sugar complained to Wells about gender discrimination in her pay package due to the difference, and her pay package was modified to include reimbursement of up to $3,500.00 in moving expenses. (Deposition of John Wells, (Docket Item No. 57-10) ("Wells Deposition"), at 28-29). Sugar never sought, nor received, any reimbursement for moving expenses. (Sugar Deposition at 34-36.)

In September 2018, Emory notified Sugar that her position would be eliminated at the end of the academic year. Sugar was called into a meeting with Wells and Kim Steiner, Vice President of Human Resources, and informed that her position was being eliminated at the end of the Spring 2019 Semester. (Sugar Deposition at 111-12.) Sugar was given separation paperwork to review. (Sugar Deposition at 112.) Other faculty members were notified that their positions also were being eliminated, including Aaron Barth in Geography and Environmental Sciences, an assistant professor hired at the same time as Sugar, Professor Hensley in Philosophy, Mary Ellis Rice in English and Dan Van Tassel in Art. (Schrum Deposition at 17; Wells Deposition at 119; Sugar Deposition at 113-14.) Wells testified that, of the faculty positions eliminated, more were held by men than women. (Wells Deposition at 119.)

There is no dispute that Emory was aware it was in a dire financial situation by January 2018, in that its accrediting agency, Southern Association Of Colleges

And Schools Commission On Colleges, had informed it by letter dated January 12, 2018, that its accreditation was at risk if it did not improve its financial stability. (Docket Item No. 57-2.) In June 2018, Emory's Board of Trustees affirmed its commitment to balance Emory's budget by 2021. (Minutes of June 8-9, 2018, Board of Trustees Meeting, (Docket Item No. 57-3).) According to Schrum, in June 2018, the upcoming academic year's student enrollment numbers exceeded expectations. (Schrum Deposition at 23-24.) In August 2018, Wells came up with a list of proposed faculty and staff positions to eliminate in an effort to balance Emory's budget. (Docket Item No. 57-12.) This list, which was set out in an email, included eliminating Sugar among 23 other faculty positions to be cut. In September 2018, the College realized that its final student enrollment numbers were insufficient to meet its financial stability goals, and, according to Schrum, Emory was forced to cut its workforce. (Schrum Deposition at 20-21.)

On November 8, 2018, Emory hosted a reception for faculty to meet with Board of Trustees members ahead of the Board's November 2018 meeting. Sugar attended this reception to speak to the trustees about the job eliminations. (Sugar Deposition at 154-55.) Sugar has testified that she approached Trustee Kathryn Copenhaver Davidson, who was speaking with another Emory professor, Deborah Spencer, at the reception. According to Sugar, during their conversation, Copenhaver repeatedly touched her, including touching her breast, gave her a long, uncomfortable hug and intimately whispered into her ear: "There, there now, everything will be alright." (Sugar Deposition at 164-66, 169-70.)[2] Sugar has

---

[2] A video recording of the reception exists which shows this encounter. The court's review of the video confirms that Davidson and Sugar did embrace for a brief moment. From the court's review, it appears that both Davidson and Sugar place at least an arm around each other.  It also appears that Davidson reached toward Sugar on several occasions, but whether she actually touched Sugar at any place on her body is not visible on the video.

testified that she considered Davidson's actions a sexual assault and an act of sexual violence against her. (Sugar Deposition at 164-65.) Sugar also testified that she considered Davidson's whispered statement to her as a violent threat. (Sugar Deposition at 166.) After this alleged assault, Sugar complained to several colleagues and filed a formal Title IX complaint with Emory. (Sugar Deposition 178-179, 186.)

Sugar met with Steiner, also Emory's Title IX Coordinator, to file her formal Title IX complaint in mid-November 2018. (Deposition of Kim Steiner, (Docket Item No. 57-20) ("Steiner Deposition"), at 19-21.) At this meeting, Sugar told Steiner the touching by Davidson was non-sexual and maternal; Sugar described the touching as Davidson brushing a crumb off of her sweater. (Steiner Deposition at 18-19, 65.) Although Sugar requested to remain anonymous, Sugar authorized Steiner to speak with Spencer, who had witnessed her encounter with Davidson. (Steiner Deposition at 20.) Spencer told Steiner that she was present for Sugar's interaction with Davidson, and she confirmed that Davidson brushed something, like a crumb, off of Sugar's sweater. (Steiner Deposition at 24-25, 65.) Spencer told Steiner that Sugar shared information that made everyone feel uncomfortable, Davidson had a strong emotional response to the information Sugar had shared, and Davidson asked, and received, permission to hug Sugar. (Steiner Deposition at 24-25, 66.)

Steiner stated that she did not interview Davidson because Sugar had requested to remain anonymous, but she did inform Wells and Schrum that there had been a Title IX complaint made against Davidson. (Steiner Deposition at 26-27.) After meeting with Sugar and interviewing Spencer, Steiner believed that she had sufficient information to move forward. (Steiner Deposition at 28.) Steiner

determined there would be no ongoing or continuing harm since board members were not on campus daily and not scheduled to return for quite some time. (Steiner Deposition at 29.) Schrum and the Board of Trustees chair contacted Davidson, and Schrum counseled Davidson regarding the issue. (Schrum Deposition at 62-64.) Steiner then informed Sugar of the conclusion of her investigation by letter dated December 14, 2018. (Steiner Deposition at 30-31; Docket Item No. 48-4.) Sugar was not provided with a copy of the investigation file, and she was not informed of her appeal or hearing rights.

After the faculty and staff job cuts were announced, the Student Government Association, ("SGA"), at Emory hosted a Town Hall meeting on December 4, 2018, for students, faculty, staff, alumni and administration to discuss the faculty and staff job eliminations. (Deposition of Katie Graves, (Docket Item No. 57-13) ("Graves Deposition"), at 54-56.) Emory student and SGA representative Katie Graves testified that the Town Hall meeting was her idea. Graves and Sugar have testified that Sugar was not involved with planning or any other aspect of the Town Hall meeting. (Sugar Deposition at 62-63; Graves Deposition at 68.) Graves did testify that she asked Sugar for advice when Graves, who was moderating the meeting, was told that the SGA could not live stream the event. (Graves Deposition at 68.) Graves also sought Sugar's guidance in drafting questions for the Town Hall meeting, in that she forwarded a draft of proposed questions to Sugar by email. (Sugar Deposition at 75-76; Docket Item No. 48-5.) Sugar attended the Town Hall meeting and asked a few questions. (Sugar Deposition at 89-90; Declaration of Katie Graves, (Docket Item No. 57-17) ("Graves Declaration") at Para. No. 25.)

After the Town Hall meeting, Dean Ryan Bowyer called four students, including Graves, into his office to discuss the recording of the Town Hall meeting,

which was done in direct violation of college policy and in direct violation of the administration's explicit instructions prior to the meeting. (Deposition of Ryan Bowyer, (Docket Item No. 48-7) ("Bowyer Deposition"), at 39-40.) Plaintiff and other professors also attended this meeting, which Bowyer said he intended to be an informal, educational meeting about the college's policy. (Bowyer Deposition at 51-52.) Bowyer testified that Sugar's behavior was disrespectful during the meeting. He said that she rolled her eyes, smirked and scoffed during the meeting to the point that he addressed her directly during the meeting to stop the behavior. (Bowyer Deposition at 48-49.) According to Sugar and Graves, it was Bowyer who acted in a rude and hostile manner toward Sugar and the other women who were present. (Graves Declaration at Para. No. 29; Sugar Deposition at 260-61.) On December 19, 2018, Sugar filed an employee grievance related to the meeting with Bowyer. (Sugar Deposition at 260-261; Docket Item No. 57-30.)

On December 20, 2018, Emory terminated Sugar's employment. Steiner has testified that she and Emory General Counsel Mark Graham met with Sugar on December 20, 2018, to inform her that she was being removed from her teaching position, but, under the terms of a proposed agreement,[3] she would continue to be paid through July 2019, the date her position was being eliminated. (Steiner Deposition at 58-59.) Steiner said that Sugar did not agree to Emory's offer, so she was notified of her immediate termination. (Steiner Deposition at 58.) The record contains a January 4, 2019, letter to Sugar terminating her employment. (Docket Item No. 57-28.)

---

[3] This proposed agreement is found in the record at Docket Item No. 57-27.

Schrum has testified that he approved Wells's decision to terminate Sugar because she was being "disruptive." (Schrum Deposition at 47-48.) When asked what of Sugar's behaviors or actions he had observed that might be classified as disruptive, he stated that he thought her actions at the Town Hall meeting were inappropriate. (Schrum Deposition at 49.) In particular, Schrum stated that Sugar asked "quite a few questions" at the meeting, and he felt "like she was … highjacking the student forum to … talk about her own complaints against the university." (Schrum Deposition at 53.) Schrum testified that he recalled Sugar complaining about being told her position would be eliminated almost as soon as she began working at Emory. (Schrum Deposition at 53-54.) Schrum said that it was not appropriate for a faculty member to "air those grievances in a student town hall meeting…." (Schrum Deposition at 54.) Schrum also stated that Sugar had been telling students that they might not ever graduate from Emory and that Emory and the Mass Communications Department might not survive with all the required budget cuts. (Schrum Deposition at 47-48.)

Wells testified that, prior to Sugar's termination in December 2018, professors in her department came to Emory's administration and complained that she had become "toxic." (Wells Deposition at 85.) He said these professors were not comfortable working with her. Wells said that Sugar was using her students to "really build a legal case against the college." (Wells Deposition at 85.) According to Wells, "It was getting back to us that she was discouraging students from being here on campus. You know, making comments that the college was not going to financially survive, encouraging other employees to really become disaffected from the college administration." (Wells Deposition at 85-85.) Wells said that faculty members Mark Finney and Tracy Lauder had complained to him about Sugar's actions in structuring her classes to "basically be a fishing expeditions to create

difficulties for the college." (Wells Deposition at 86-87.) Wells also testified that Jolie Lewis, Lauder and Bowyer had notified him that Sugar was using her classes to build a legal case against the college. (Wells Deposition at 88.)

Finney testified that he had conversations with Wells and Steiner regarding his concerns that Sugar was telling students negative things about him and the mass communications program. (Deposition of Mark Finney, (Docket Item No. 48-9) ("Finney Deposition"), at 65, 73.) Finney said that Graves had told him that Sugar had discouraged her from taking an internship with a business he had started, claiming that he and his partners might sexually harass her. (Finney Deposition at 66-67.) Finney said that he attempted to meet with Sugar to discuss these statements, but she never attended the meetings. (Finney Deposition at 68.) Finney testified that another student, Emily Hinchey, had informed him that Sugar had encouraged her and other students to transfer and had criticized the program to the students. (Finney Deposition at 69.) Finney also stated that he observed Sugar speak about how incapable the faculty would be teaching a mass communications curriculum without her. (Finney Deposition at 71.)

Sugar has admitted that she was considering litigation against Emory from the moment she learned of the termination of her position on or about September 24, 2018. (Sugar Deposition at 266-67.) Sugar also admitted that she announced to her class that her position would be eliminated in June 2019 as part of Emory's reduction in workforce. (Sugar Deposition at 73-74.) She admitted that she took a poll of her class to determine if any students planned to transfer from Emory. During this poll, one student reported that her transfer application had been accepted, and the rest of the class applauded. (Sugar Deposition at 145-52.) Sugar reported to Jolie Lewis that 72 percent of her students were considering transferring. (Deposition of Jolie Lewis,

(Docket Item No. 48-10) ("Lewis Deposition") at 70-72.) Sugar also has admitted that she assigned the students in one of her classes to research perceived mismanagement at Emory for a graded assignment. (Sugar Deposition at 280-84.)

Sugar has provided a declaration from one of her students, Emily Hinchey, stating that she had applied to transfer to Radford University, but withdrew that application. (Declaration of Emily Hinchey, (Docket Item No. 57-16) ("Hincey Declaration"), at 1.) Hinchey stated that she had informed Sugar of her possible transfer, and Sugar had neither encouraged nor discouraged her from transferring. (Hinchey Declaration at 1.) Hinchey also stated that Sugar cared for her students and supported their academic pursuits. (Hinchey Declaration at 2.) She said that students in the Mass Communications Department were "extremely upset and dismayed" when they learned that Sugar's employment was terminated. (Hinchey Declaration at 2.)

Sugar also has provided the deposition testimony of Dr. Alana Simmons, the former Director of Emory & Henry CARES, a federally funded grant program. (Deposition of Dr. Alana Simmons, (Docket Item No. 57-11) ("Simmons Deposition")). Simmons testified that she worked in this position at Emory from February 2017 until she resigned in December 2018. (Simmons Deposition at 7, 12.) Simmons testified that she attended the Town Hall meeting in December 2018 and that Sugar's actions at this meeting were not unprofessional or inappropriate. (Simmons Deposition at 17.) Simmons did testify that she recalled that Sugar asked questions about her employment at the meeting. (Simmons Deposition at 59.) Simmons also testified that another Emory employee, Peter Stephenson, Emory's Director of Recreation, had told her that he had overheard someone say that Sugar was "trouble." (Simmons Deposition at 31-32.) Despite Sugar's assertions to the

contrary in her briefing, Simmons did not provide evidence that Sugar was "flagged as a 'troublemaker' by [Emory's] administration, due to her complaints of gender discrimination and advocacy for gender, race, and sectarian equality on campus." (Docket Item No. 57 at 6.) Simmons further testified that after the incident with Davidson, Sugar came by her office and told her that she was talking to a group of professors at the reception when Davidson walked up to her and extended her hand and touched her breasts without her consent. (Simmons Deposition at 40, 63, 64.) Simmons did not recall that Sugar said that Davidson hugged her. (Simmons Deposition at 65.) According to Simmons, "Dr. Sugar exclaimed that she was mortified by this and she was just shocked and traumatized by what had happened." (Simmons Deposition at 40.) At another point, Simmons said that "Sugar conveyed to me that she was horrified by what happened…." (Simmons Deposition at 67.) Simmons testified that she was present as Sugar's support person when she met with Steiner to report the incident. (Simmons Deposition at 44.)

## II.    Analysis

With regard to a motion for summary judgment, the standard of review is well-settled.   The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. Thus, the court will view the facts and inferences in the light most favorable to the plaintiff on the defendant's Motion. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996).

In this matter, Sugar's remaining claims include breach of contract, sex discrimination and sex-based wage discrimination, disparate treatment, disparate impact and retaliation under Title VII and sex discrimination and retaliation under Title IX. Emory has moved for entry of summary judgment in its favor on all remaining claims.

Under Virginia law,[4] to prevail on her breach of contract claim, Sugar must show:

> … (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.

---

[4] Sugar's pendent breach of contract claim is governed by Virginia state law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Occidental Fire & Cas. Co. v. Bankers & Shippers Ins. Co.*, 564 F. Supp. 1501, 1503 (W.D.Va. 1983) (under Virginia law, place of performance of a contract governs issue of performance.)

*Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004). In her Complaint, Sugar alleges that Emory breached her employment agreement for a "tenure-track" position as set out in her Offer Letter when it eliminated her position effective in June 2019. Nonetheless, Sugar has admitted that receiving a tenure-track position did not guarantee that she would receive tenure. Sugar has admitted that whether a professor received tenure depended not only on the professor's job performance, but also upon the institution's ability to offer a tenured position. More importantly, Sugar also admitted that she knew that her employment at Emory was terminable at-will.

Under Virginia law, when employment is terminable at-will, the employment is terminable by either party at any time. *See Weaver v. Coca-Cola Bottling Co.*, 805 F. Supp. 10, 11 (W.D. Va. 1992) (citing *Miller v. SEVAMP*, 362 S.E.2d 915 (Va. 1987)). The Supreme Court of Virginia has carved out narrow exceptions to the at-will employment doctrine for violations of Virginia public policy. *See Jordan v. Town of Front Royal*, 2008 WL 2465033, at *1 (W.D. Va. June 16, 2008) (citing *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985)). In particular, the Virginia Supreme Court has held that the public policy exception recognized in *Bowman*, includes instances where employees are terminated because of discrimination based upon gender or race. *See Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 332 (Va. 1994). Thus, Sugar's breach of contract claim will survive summary judgment only if her claim for gender discrimination survives.

Sugar's Complaint alleges gender discrimination under both Title VII and Title IX. Employment discrimination based on gender or sex discrimination in violation of either Title VII or Title IX can be proven by direct or circumstantial evidence. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983). Direct evidence is "'conduct or statements that both reflect directly the

alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Spain v. Va. Commonwealth Univ.*, 2009 WL 2461662, at *7 (E.D. Va. Aug. 11, 2009) (quoting *Rhodes v. FDIC*, 257 F.3d 373, 391-92 (4th Cir. 2001)). Absent direct evidence, the elements of a prima facie Title VII sex discrimination case are established through the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Furthermore, claims of discrimination in employment under Title IX are evaluated borrowing from the Title VII framework. *See Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206-07 (4th Cir. 1994).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment. *See Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012); *Colley v. Dickenson Cnty. Sch. Bd.,* 2018 WL 4266864, at *6 (W.D. Va. Sept. 6, 2018). If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011). The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). If the employer articulates such a reason, the burden returns to the plaintiff to prove that the employer's stated reason was actually a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *see also Bonds*, 629 F.3d at 386.

Here, Sugar has advanced no direct evidence of sex discrimination. Thus, her discrimination claims must be analyzed using the burden-shifting scheme in *McDonnell Douglas*. For the reasons that follow, I find that Sugar fails to meet her burden of establishing a prima facie case of sex discrimination. First, it is clear that Sugar, as a female, is a member of a class protected under Title VII and Title IX. Second, Sugar suffered an adverse employment action, in that she was terminated from her position at Emory.[5] Sugar has not, however, produced acceptable evidence that she was performing her job satisfactorily at the time of her termination.

The appropriate test is whether Sugar was meeting the legitimate expectations of her employer at the time of her termination. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Having never been suspended or otherwise disciplined does not necessarily lead to the conclusion that Sugar was meeting the legitimate expectations of her employer. "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *King*, 328 F.3d at 149 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (citations omitted)). It is important to note that the Fourth Circuit in *King* held that an employee's own testimony or a co-worker's fact testimony that he was performing his job satisfactorily at the time of termination is not sufficient to establish this prong of the prima facie case. *See* 328 F.3d at 149.

---

[5] In her Complaint, Sugar also alleged that she was discriminated against in violation of Title VII and Title IX by Emory not paying her and other female Emory employees compensation equal to comparable male employees. The only evidence Sugar has produced of any discrepancy between her pay package and that of her male counterparts is that she, initially, was offered only $1,500.00 in reimbursement for moving expenses. When this discrepancy was brought to the attention of the administration, Sugar also was offered $3,500.00 reimbursement in moving expenses. Therefore, Sugar cannot show any difference in the pay package that she received.

Here, the only evidence Sugar has produced of satisfactory job performance is evidence that she had not been disciplined under Emory's progressive disciplinary policy and the statement of a student that she and other students were upset and dismayed by Sugar's termination. To the contrary, Emory has provided evidence from the persons who made the decision to terminate her employment that she was not satisfactorily performing her job. Schrum has testified that he approved terminating Sugar because she had become "disruptive," telling students that Emory and/or the Mass Communications Department might not survive. Wells has testified that at least two professors in the Mass Communications Department had complained that Sugar had become "toxic" and they were not comfortable working with her. They complained that Sugar was discouraging students and using the students to build her legal case against Emory.

Thus, the uncontradicted evidence of record is that, in the eyes of the decision makers, Sugar was not satisfactorily performing her job at the time she was terminated. Furthermore, the evidence of satisfactory performance offered by Sugar, i.e., the lack of any disciplinary proceedings and the satisfaction of a student with her performance, are not legally sufficient under the controlling Fourth Circuit precedent. Therefore, I will enter summary judgment in the defendant's favor on Sugar's discrimination claims under Title VII and Title IX.[6]

Turning to Sugar's retaliation claims under Title VII and Title IX, to present a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a

---

[6] Sugar's Complaint also alleges a discrimination claim based on disparate impact. Sugar, however, has produced no evidence that Emory took any action or had in place any policy that had a disparate impact on women. *See Flores v. Va. Dep't of Corrs.*, 2021 WL 668802, at *7 (W.D. Va. Feb. 22, 2021) (employee in a disparate impact case is responsible for identifying specific employment practices that are responsible for numerical or statistical disparities).

protected activity; (2) her employer took adverse action against her; and (3) there was a causal connection between the protected activity and the adverse action. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Courts apply the same standards in ruling on a Title IX retaliation claim as on such a claim under Title VII. *See Stennis v. Bowie State Univ.*, 716 F. App'x 164, 166 (4th Cir. 2017) (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994)).

Here, Sugar has presented evidence that she engaged in a protected activity, in that she had complained that she had been discriminated against based on her sex in the amount of moving expenses she was offered, filed a grievance over her alleged discriminatory treatment by Dean Bowyer and filed a formal Title IX complaint regarding her encounter with Davidson. Sugar also has presented evidence that her employer took adverse action against her, in that her position was targeted for elimination at the end of the academic year and, then, she was immediately terminated from her employment in December 2018. Sugar argues that she also has presented evidence of a causal connection between her protected activity and the adverse action, in that the undisputed evidence is that her position was targeted to be eliminated only two months after she complained of discrimination in her offer of moving expenses and in that she was terminated only five days after the conclusion of the investigation of her Title IX complaint and only one day after filing her grievance against Bowyer. Sugar argues that this temporal proximity is sufficient to create a jury question as to whether Emory's actions were taken in retaliation for her protected activity.

In *King*, 328 F.3d at 151, the Fourth Circuit held that temporal proximity between an employee's protected activity and the employer's adverse action was sufficient evidence to satisfy the causation requirement of a prima facie case. *See*

*also Al-Habashy v. Va. Dep't. of Juvenile Justice*, 2015 WL 5916007, at *7 (W.D. Va. Oct. 8, 2015) (causation at prima facie case stage can be satisfied by temporal proximity between protected activity and adverse action).  In *King*, the employer's adverse action occurred two-and-one-half months after the employee's protected activity. *See* 328 F.3d at 151 n.5. Based on this, Sugar's evidence of temporal proximity is sufficient to meet her burden of production to show a prima facie case of retaliation.

Once a prima facie case of retaliation is established, it must be rebutted by a legitimate nondiscriminatory reason for the employer's adverse action. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). If the employer meets its burden of production in response to the employee's prima facie case, the burden then shifts to the plaintiff to establish, by the preponderance of the evidence, that the proffered reason were pretextual. "[T]he causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous.'" *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (quoting *Williams*, 871 F.2d at 457). At the pretext stage, the employee's circumstantial evidence of unlawful intent, is not sufficient to create a jury question. *See Williams*, 781 F.2d at 459. To meet the ultimate burden of persuasion, and create a jury question, that she has been the victim of retaliation at the pretext stage, a plaintiff must produce evidence that the employer's stated reasoning for its adverse action was false and that retaliation was the real reason for the adverse action. *See Foster*, 787 F.3d at 252. Again, "it is the perception of the decisionmaker which is relevant." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (internal citation and quotation marks omitted).  When an employer articulates a legitimate, nonretaliatory reason for an employment action, the issue is not whether the reason for the action was "wise, fair

or even correct, ultimately, so long as it truly was the reason" for the action. *See Al-Habashy*, 2015 WL 5916007, at *9 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)).

Therefore, while evidence of temporal proximity is sufficient to establish causation for a prima facie case, it is not sufficient, standing alone, to prove pretext. As outlined above, Emory has offered evidence that it fired Sugar because she had become disruptive and was sowing discord among students and fellow faculty members. This evidence meets Emory's burden to produce evidence of a legitimate, nondiscriminatory reason for its adverse action against Sugar. Sugar has produced no evidence that the reasoning offered by Emory for her job elimination or her firing was pretextual. In fact, Sugar, in her briefing, concedes that, when she accepted employment with Emory, Emory was in a dire financial condition, placing its continuing accreditation at issue. While Sugar has offered evidence from Simmons that her conduct at the Town Hall meeting was not unprofessional or inappropriate, Simmons was not a decisionmaker with regard to Emory's actions against Sugar. Therefore, her opinions of Sugar's actions are not relevant evidence on the issue of pretext. The same is true of Sugar's evidence from Emory students that they were satisfied with her performance.

Sugar also argues that Emory's failure to follow the procedural requirements of Title IX or even its own Title IX policy shows its discriminatory intent. However, procedurally or otherwise flawed Title IX proceedings, standing alone, are not proof of discriminatory intent. *See Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 578 (E.D. Va. 1996). A plaintiff must show a causal connection between the allegedly flawed proceedings and the alleged discrimination. *See Haley*, 948 F. Supp. at 578 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994)). "Title

IX does not require flawless investigations or perfect solutions." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011) (citing *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008)); *see also Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007).

Insofar as Sugar argues that the procedurally flawed Title IX proceeding, itself, was the discriminatory action, Sugar has produced no evidence that she, as a woman, was treated any differently from anyone else who might have raised a Title IX claim. *See Haley*, 948 F. Supp. at 580-81. Thus, Sugar fails to make out a prima facie case for such a claim.

Sugar also argues that Emory is liable under Title IX for its "deliberate indifference" in the handling of her Title IX claim.  To bring a claim under Title IX for "deliberate indifference," the misconduct alleged by the plaintiff must be sexual harassment. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 675 (M.D. Tenn. 2018). "Only claims involving pervasive and widespread harassment are actionable; a single incident is not enough." *Z.J.*, 355 F. Supp. 3d at 675. Furthermore, "[a]lleged sexual harassment in the form of a failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim." *Z.J.*, 355 F. Supp. 3d at 675-76 (citing *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014); *Sanches,* 647 F.3d at 169).  Also, the Supreme Court has held that a defendant's failure to comply with Title IX regulations does not itself constitute discrimination under Title IX. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 291-92 (1998).

Here, Sugar's Title IX complaint involved the November 8, 2018, touching by Trustee Davidson. While Sugar's version of this incident, if found to be credible, would constitute sexual harassment, it is a single incident confined to a few minutes of time. Sugar has not provided any evidence of pervasive and widespread harassment by Davidson or anyone else affiliated with Emory. Furthermore, while Sugar may not be satisfied with Emory's investigation and findings regarding her Title IX complaint, the fact that Emory may not have fully complied with Title IX regulations or its own policies does not give rise to a deliberate indifference claim.

### III.    Conclusion

Based on the above-stated reasons, I find that there is no genuine dispute as to any material fact on Sugar's remaining claims and that Emory is entitled to judgment as a matter of law. An appropriate Final Order and Judgment will be entered.

**DATED:** July 28, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE